UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION


CHRIS TINDELL, CYNTHIA GRAVES,  )
and GLENN TINDELL,  )
  )
      Plaintiffs,  )
  )
      vs.  )        3:09-cv-159-SEB-WGH
  )
EVANSVILLE-VANDERBURGH  )
SCHOOL CORPORATION and  )
EVANSVILLE-VANDERBURGH-POSEY )
SPECIAL SERVICES COOPERATIVE,  )
  )
      Defendants.  )


**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**


This cause is before the Court on cross-motions for summary judgment filed by

Plaintiffs on May 5, 2010 [Docket No. 31] and by Defendants on June 28, 2010 [Docket

No. 35].  Plaintiffs, Chris Tindell ("Chris") and his parents, Cynthia Graves and Glenn

Tindell (collectively, "the Parents"), bring this action against Defendants, Evansville-

Vanderburgh School Corporation and Evansville-Vanderburgh-Posey Special Services

Cooperative (collectively, "the School"), alleging that Defendants denied Chris a free,

appropriate public education ("FAPE"), and thus violated the Individuals With

Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, as incorporated in 511 IAC Article

7-32 through 7-47 ("Article 7").  For the reasons detailed in this entry, we <u>DENY</u>

Plaintiffs' Motion for Summary Judgment and <u>GRANT</u> Defendants' Motion for

Summary Judgment.

## **Factual Background**

Chris is a nineteen-year-old student who suffers from autism spectrum disorder and is presently in residential placement at the College Internship Program in Bloomington, Indiana. In 1998, when he was in second grade, Chris was first identified as qualifying for special education and related services due to a "learning disability of written expression." (R. at 4582). Chris attended elementary and middle school in the Vanderburgh County School system, but as his problems became more severe, the School identified his primary disability as an "emotional handicap" and, in early 2004, Chris ceased attending school in the classroom and began homebound instruction. Id. At all relevant times, Chris's individualized education programs ("IEP")[1] have recognized that he has the following additional health problems: Attention Deficit-Hyperactivity Disorder ("ADHD"), Anxiety Disorder-Not Otherwise Specified, sensory processing disorder, migraines, asthma, GI reflux, foot pain, and food allergies. Chris's IEPs also indicated that he was receiving a number of medications for these mental and physical conditions.

As early as 2002, Chris was evaluated by Deidre Scheu, O.T.R., an occupational therapist from The Rehabilitation Center, Inc.,[2] who concluded that, based on Chris's history, a diagnosis of Asperger's Syndrome could not be ruled out. (R. at 435). In her

---

[1] An IEP is a written statement establishing how a school district will provide an IDEA-compliant education. See 20 U.S.C. § 1414(d).

[2] The Rehabilitation Center is located in Evansville, Indiana.

report, Ms. Scheu also diagnosed Chris with bipolar disorder, ADHD, and sensory

processing/modulation disorder. (R. at 434-35). In early 2004, Chris's mother, Dr.

Graves, provided the School with medical reports identifying Chris's disabilities as

dysgraphia, non-verbal learning disorder, Asperger's Syndrome, anxiety disorder,

Pervasive Developmental Disorder-Not Otherwise Specified ("PDD-NOS"),[3] Attention

Deficit-Hyperactivity Disorder ("ADHD"), and bipolar disorder. (See R. at 434-35, 449,

3783). The documents provided to the School included a February 23, 2004 letter from

Chris's psychiatrist, Louis B. Cady, M.D., stating that "Chris is a 13 year old young man

with a working diagnosis of Asperger's Syndrome." (R. at 439). In that letter, Dr. Cady

also opined that, because of the escalation of Chris's frustration and anxiety, Dr. Cady

supported "the provision of homebound services for this young man." Id.

In light of Dr. Cady's suggestion that Chris might have Asperger's Syndrome, on

March 11, 2004, the School performed a psychological evaluation that, in part, assessed

Chris for the disorder.[4] (See R. at 450). Following the evaluation, the School

---

[3] PDD-NOS is a condition on the autism spectrum reserved for individuals exhibiting some, but not all, of the symptoms associated with classic autism.

[4] In preparation for Chris's evaluation, his mother, Dr. Cynthia Graves, provided the School with a ten-page document she had prepared as background information for the School's psychologist. Dr. Graves, who worked full-time in a private pediatric practice with a focus on behavioral problems prior to Chris's birth, stated the following concerns:

Chris has been diagnosed with a variety of things, including anxiety disorder, NOS, ADHD, Asperger's, PDD NOS, and Bipolar disorder. The 'label' that most closely describes his difficulties to me is **non-verbal learning disorder**. All the children I read about with this fit Chris to a T. He clearly has sensory integration

(continued...)

psychologist, Marilyn Pickering, opined that: "Chris's behavior pattern is very unlikely to reflect Asperger['s] Syndrome." (R. at 457). In her report, Pickering further concluded as follows:

> Chris is functioning within the above average range intellectually with academic skills in written language severely discrepant. The profile presented by the student in this evaluation supports continued eligibility for Learning Disability Services. Eligibility for Emotionally Disabled services may also be considered. The Case Conference Committee will determine the child's educational needs, consider eligibility criteria for special education services, and make placement and programming recommendations.

(R. at 458). The School sent copies of that evaluation to the Parents, Chris's therapist, Vicki Lake, and Chris's psychiatrist, Dr. Cady. The Parents did not dispute Ms. Pickering's conclusions and Chris's disability classification remained unchanged.[5]

---

[4](...continued)
problems, directional impairment, tendency to anxiety and limited frustration tolerance, focuses on the details rather than the 'big picture,' shows a preference for math and science, and has a strong auditory memory. He has always required instruction to pay attention to the facial expressions and body language of others, as this tends to escape his notice. He is very concerned about [the] 'fairness' of things, and rigid about rules. His frustration tolerance is poor, and once upset he has difficulty calming down. His vocabulary is remarkable, and he expresses himself eloquently as long as it is spontaneous. Motor skills are impaired, as evidence by dysgraphia, inability to ride a bike, lack of stamina, and fine motor delays. Grooming and hygiene require close monitoring by his family, as he doesn't care how he looks to others, as long as he feels comfortable.

(R. at 449) (emphasis in original).

[5] Plaintiffs concede that they did not object to the results of the assessment at that time, but contend that the reason they did not challenge the evaluation was because they did not learn until the due process hearing that the assessment for Asperger's Syndrome had consisted solely of one Asperger Syndrome Diagnostic Scale checklist which was allegedly completed by a resource teacher who had observed Chris only briefly and lacked any medical background.

Beginning in 2004, Chris's case conference committee ("CCC")[6] held meetings to discuss Chris's progress and to plan for his future. Dr. Graves attended all of these case conferences, each of which lasted on average more than an hour. (R. at 3901). At the May 3, 2005 CCC meeting, Chris's current level strengths, needs, and individual student interests were reviewed and an individual transition plan for Chris was discussed. (R. at 1589-92). In April 2005, the CCC anticipated that Chris would attend college with appropriate support. (R. at 1590). The transition services discussed for Chris during the 2004-2005 school year included interpersonal coping skills, the use of a scribe for his schoolwork, and the ability to travel around the building. (R. at 1592).

On September 13, 2005, Chris's IEP described his primary educational disability as emotional with a secondary learning disability. (R. at 1544). Under the IEP, the School provided Chris with occupational therapy and behavior therapy consultation services and various general education accommodations to address his needs. (R. at 1542-49). The IEP further specified that Chris would attend Bosse High School for two periods of regular classroom instruction per day and receive homebound services for two hours per day for three classes. (R. at 1546.) In addition, the IEP listed as a determined need "[p]sychological evaluation to rule out Autism Spectrum Disorder, PDD,

---

[6] The IDEA mandates that a "case conference" be convened at least annually for every child with a disability at which "the student's parents or guardians, teachers and other specialists meet to document the student's limitations and needs, to set individualized educational goals, and to incorporate these in [the IEP] for each school year outlining the services and instruction necessary to achieve the goals." Weyrick v. New Albany-Floyd County Consolidated School Corp., 2004 WL 3059793, at *2 (S.D. Ind. Dec. 23, 2004).

Asperger's, or TBI." (R. at 1543). The parents expressed no disagreement with the IEP recommendations and gave permission for their implementation. (R. at 1549).

Approximately two weeks later, on September 26, 2005, the School's psychologist, Sylvia Schutte Groves, spoke with Dr. Graves regarding her interest in scheduling additional psychological evaluations for Chris per the September 13 IEP. (R. at 2063). Dr. Graves indicated that she was not interested in additional evaluation measures and refused to consent to further tests for autism, PDD-NOS, Asperger's or traumatic brain injury. (R. at 3807, 3912-12). According to Dr. Graves, she withheld her consent because the tests were extremely stressful for Chris and the School had advised her that, even if there were a change in Chris's disability classification following further testing, that change would not alter the programming and services he would receive from the School. (R. at 990, 3799-3800). Thus, Chris did not receive further evaluation at that point.

The Parents and parent advocate, Paula Guzzo, attended another CCC meeting on May 2, 2006. At that meeting, it was determined that Chris's educational disabilities remained unchanged and that his first need was "NEEDS CREDITS TO GRADUATE." (R. at 528). Chris's IEP increased the time he was to attend classes at Bosse High School to four periods per day, including a resource/study skills class in the Special Education classroom, and he was to receive homebound services for two classes per day. (R. at 531). The IEP included a list of twenty-six general education considerations which set forth various adaptions, modifications, and personnel supports that would be offered to

Chris, including, *inter alia*, frequent breaks to reduce anxiety in the classroom, the ability to take classroom tests with his homebound teacher, and use of electronic devices in the classroom during instruction to reduce anxiety. (R. at 529-30). The CCC also completed a functional behavior assessment, established a behavior intervention plan, and drafted instructional goals and objectives for Chris. (R. at 534-43). At that time, the CCC expressly anticipated that, after graduation, Chris would attend college or university with support. (R. at 1666). With regard to transition services, it was noted that Chris wanted to get a job at the bowling alley, that he does his own laundry and garbage, and that he needed to work on his ability to travel independently around the building and to use the city bus system. (R. at 1668). The Parents agreed with the recommendations contained in the IEP and gave permission for their implementation. (R. at 553).

Four months later, on September 26, 2006, another CCC meeting was held, which the Parents and Ms. Guzzo attended. At that meeting, for the first time the IEP included PDD-NOS (a condition on the autism spectrum) as one of Chris's health problems, but neither his primary diagnosis nor his disability classification was altered based on that addition. (R. at 547). The IEP also listed "[n]eeds homebound instruction to address anxiety" as a new determined need. Id. Although Chris was receiving As and Bs in the classes he was taking, his teachers all reported that he rarely attended class. Id. In light of the anxiety issues Chris faced in relation to attending school outside of his home at that time, his least restrictive environment ("LRE") was changed to homebound placement with the exception of a chemistry class that he was to continue to attend at Bosse High

School.  (R. at 550-51).

Dr. Graves and Ms. Guzzo both attended the next CCC meeting on November 16, 2006.  At that meeting, the CCC added "[n]eeds support when writing to address disability in written expression" as a determined need.  (R. at 555).  Chris's LRE remained homebound, with the exception of his chemistry class, which he was to continue to attend outside the home.  (R. at 558).  The Parents agreed with the recommendations in the IEP and gave permission for their implementation.  (R. at 1580).

Plaintiffs contend that, from 2004 through 2007, they sought several services for Chris, including, *inter alia*, a sensory diet, travel training, services for his learning disability and social skills training, but that the School rejected all of those ideas.  (R. at 3786-88, 3820).  Because Chris's problems persisted despite the treatment he was receiving, on March 6, 2007, the Parents obtained a private evaluation from the Children's Resource Group ("CRG") in Indianapolis.  (R. at 459-73).  Following the CRG's evaluation of Chris, Ann H. Adinamis, M.D., Diplomate of the American Board of Psychiatry and Neurology, opined as follows:

> Based on the information obtained from available records and clinical interview, Christopher meets the criteria for **Bipolar Disorder-Not Otherwise Specified** (symptoms of mania/hypomania and depression). Currently his mood is not stable, and is predominately depressed.  In addition, Christopher meets the criteria for **Generalized Anxiety Disorder**. He describes partial panic attacks that are cued by school and social stresses.  Christopher's history is also consistent with the diagnosis of **Attention Deficit Hyperactivity Disorder-Combined Type** due to his longstanding struggles with inattention, hyperactivity and impulsivity. Finally, Christopher's presentation is consistent with the diagnosis of **Pervasive Developmental Disorder Not Otherwise Specified (PDD-**

**NOS).** Specifically, he meets the three classic criteria of an autism spectrum disorder: (1) Impaired social interaction with failure to develop relationships, lack of reciprocity and impaired nonverbal communication (2) Restricted repetitive, stereotyped behaviors and preoccupations inflexible mannerisms (3) Language abnormalities (early language delays and pragmatic, social communication language difficulties). While Christopher has previously been diagnosed with Asperger's Disorder (and he certainly fits the picture, particularly with his above average intellect), the presence of early language delays diagnostically necessitates the diagnosis of PDD-NOS. Certainly, the differentiation between these two types of autism spectrum disorders is difficult in Christopher's case. Nevertheless, the therapeutic interventions for this diagnostic piece would be similar. It should be noted that these conclusions were obtained without the benefit of review of recent psychological testing (including projective testing) completed at Children's Resource Group concurrently with this evaluation.

(R. at 469). In her report, Dr. Adinamis also set forth a suggested treatment plan for

Chris, which included the following recommendation:

> Given the severity of Christopher's psychiatric difficulties and the negative impact on his social, academic and emotional functioning, I believe that residential treatment should be considered. ... It would be important that Christopher be involved in a program that appreciates his intellectual strengths (many children with autism spectrum disorder have intellectual impairment). I have some concern about the current severity of Christopher's anxiety and the impact of residential placement on him when he is experiencing such anxiety. I think he has been traumatized in the past by bullying, and it would be extremely important to be sure that this did not occur in a residential placement. If any of the above medication suggestions are helpful in alleviating some of Christopher's acute symptoms, he may be more amenable to residential treatment. Certainly if Christopher develops serious suicidal/homicidal ideation/behavior, inpatient psychiatric treatment may become necessary.

(R. at 472).

The CRG concurrently completed a psychological evaluation of Chris, following

which the evaluating psychologists concluded as follows:

Information received from Chris and his parents, current test results, his history and clinical observations during testing indicate that Chris is a complex young man who has multiple issues that adversely impact his functioning. First, these results are strongly indicative of mood dysregulation for Chris which is a long-standing issue for him. His symptom pattern is supportive of mania, hypomania, and depression which warrant a diagnosis of Bipolar Disorder-Not Otherwise Specified. Second, Chris also has longstanding symptoms similar to students on the Autism Spectrum. He has significant social difficulties, obsessive levels of interest in a narrow range of topics and a number of hypersensitivities. This symptom patter warrants a diagnosis of Pervasive Developmental Disorder-Not Otherwise Specified. Third, Chris has ongoing difficulties with sustained attention, impulsivity and hyperactivity thus he is diagnosed with an Attention Deficiet Hyperactivity Disorder-Combined Type. One of the most prevailing symptoms that impacts Chris's functioning on an almost daily basis is his level of anxiety which at times can overwhelm him creating panic and avoidance. Thus an additional diagnosis of Anxiety Disorder-Not Otherwise Specified is warranted for Chris.

(R. at 489-90). With regard to the option of a full-time placement in a residential program, the CRG staff advised that: "[I]t is recommended that time be given to implement the medication plan and therapeutic plan recommended above before pursuit of possible residential placement. If in the future this is pursued, his parents will want to visit and make certain the facility can meet all of Chris's needs. They may want to work with a private consultant to get professional advice on the available options for Chris." (R. at 490).

The School and the Parents convened for another CCC meeting on November 13, 2007. In addition to the Parents, Mr. Wiggers, Suzette Fritz (Chris's homebound teacher), Jacalyn Hoekstra (Chris's special education teacher), Elizabeth McGovern (building administrator), and Hope McCoy (vocational rehabilitation counselor), were all

in attendance. At that meeting, the CCC added Bipolar Disorder-Not Otherwise Specified as a health problem and the need for homebound instruction to address anxiety as a determined need on the IEP. (R. at 561). Despite the diagnoses contained in the CRG reports, Chris's IEP remained unchanged with regard to his disability classification, still listing "emotional disability" as his primary disability and "learning disability" as the secondary disability. (R. at 562). Chris's LRE was changed to a combination of regular class and homebound instruction. (R. at 563). The IEP from that meeting states that a transition plan for Chris would be developed and discussed at the annual case review later that year. Chris's IEP also listed nineteen adaptions and modifications that he was allowed, which included, *inter alia*, extended time for completing assignments, the services of a scribe for all written assignments and tests, and preferential seating away from distractions. (R. at 562).

The CCC also completed a functional behavior assessment at the November 13 meeting, concluding that anxiety often prevented Chris from attending class and that his repeated absences would in turn trigger more anxiety which limited his ability to attend school. (R. at 565-66). Accordingly, a behavior intervention plan was created with the goal of reducing or eliminating the behavior causing Chris's absences. (R. at 567). Dr. Graves agreed with the recommendations in the IEP, including consenting to behavior therapy being dropped as a related service, and gave permission for their implementation. (R. at 575). Chris's frequent absences did not abate, however, and on January 31, 2008, the CCC changed his FRE back to homebound. (R. at 580). At that meeting, the CCC

also discussed a December 2007 recommendation from Dr. Adinimas of the CRG that residential placement be considered for Chris.

The Parents and parent advocate Guzzo attended the March 5, 2008 CCC meeting. "[D]ecrease anxiety" was added to the IEP as a determined need; Chris's LRE, level of services, functional behavior assessment, and behavior intervention plan all remained substantially unchanged. (R. at 592). At the conclusion of the meeting, the CCC decided to commence an exploration of residential programs for Chris. (R. at 599). Dr. Graves agreed with the recommendations in the IEP and gave permission for their implementation. Id.

At the April 11, 2008 CCC meeting, the School for the first time amended Chris's primary disability classification to autism spectrum disorder, with secondary emotional and learning disabilities. (R. at 616-18). The CCC concluded that Chris had fourteen determined needs, created a list of twenty-one special classroom considerations for him, and changed his LRE to a residential facility. (R. at 617-21). A representative from the Autism Spectrum Behavioral Learning Environment ("ABLE") program at the Gibault Home in Terre Haute, Indiana ("the Gibault School" or "Gibault"), addressed the CCC and explained the services that would be available to Chris if he were placed in that program. (R. at 1043-44). It was agreed that a team from the Gibault School would observe Chris the following week to determine if he met the criteria for the ABLE program. (R. at 644).

Chris continued to receive homebound education until June 2008, when, with the

Parents' consent, he was placed by the School in the ABLE program at the Gibault School. (R. at 390). The ABLE program has a self-contained classroom and the Gibault School also operates Holy Cross High School ("Holy Cross"), a private high school accredited by the State of Indiana. Prior to entering Gibault, Chris had earned twenty-two credits toward graduation, thirteen of which were earned on full or partial homebound programs. Upon Chris's enrollment and placement at the Gibault School, a treatment plan was created for him and a projected discharge date was set for June 2009, with an additional year of aftercare services following his discharge. (R. at 1072, 1092). The objectives of the treatment plan were defined as follows:

> Chris and his family will learn alternative methods to help Chris cope with frustration besides electronics and assist Chris [in] functioning in environments outside of the home. He will attend all classes and earn credits towards a diploma, participate in recreation daily earning a 70% in the area of sportsmanship, develop a level of trust and rapport with his therapist as evidenced by attending all scheduled therapy sessions and engaging in conversations about thoughts and feelings and comply [with] all medical procedures.

(R. at 1071). On July 8, 2008, a copy of the treatment plan was mailed to the Parents. (R. at 1885).

The Gibault School also provided the Parents with a monthly residential treatment review, identifying each area in which Chris was to receive services and outlining the types of services that were offered and whether he accepted or participated. Chris's July 2008 treatment review, for example, indicates that he completed lessons in "budgeting bills" and "menu planning, basic food groups, consumer tips and nutritional facts." (R. at

13

1889).  Chris had the opportunity to provide comment and respond to the monthly treatment plan review, which he did on some occasions.  (R. at 1891).  In addition, the Gibault School provided the School and the Parents three-month quarterly residential treatment plans and reviews.  (R. at 1903).

On September 9, 2008, another case conference was held, which was attended in person by the Parents, Chris, and various members of the Gibault Treatment Team.  Mr. Wiggers, the School's special education coordinator, attended via telephone.  At that meeting, the attendees reviewed Chris's progress, noting that he had mastered engaging in direct academic instruction for at least two hours per day.  (R. at 1658).  The principal of Holy Cross, Gibault's fully-accredited high school, explained the courses Chris was taking and his participation in the "credit recovery program," which is a self-paced computer-based learning program.  (R. at 662).  The CCC also discussed Chris's transition plan and noted that a statement of needed transition services would be determined at the next CCC meeting.  (R. at 669).

The next CCC meeting occurred on February 20, 2009.  The IEP listed Chris's grades and levels of performance as A or A- in twelfth grade equivalent classes, such as English 12 and Algebra 2.[7]  (R. at 674).  The CCC identified Chris's determined needs, which included, *inter alia*, "[s]upport in all academic areas due to sensory and anxiety

---

[7] In a letter to the School dated March 9, 2009, the Parents disputed these grades, stating that, according to his report card dated March 4, 2009, he was receiving the following grades: C in Applied Music; B+ in Physical Education; A in Computer Applications; B- in Earth and Space Science; B in English 12; and A in Instrumental Ensemble.  (R. at 686).

14

issues" and "[c]omplete requirements for graduation."  Id.  One of the eleven goals set for Chris at that meeting was to "earn credits toward graduation."  (R. at 1676). Chris's transition plans were also discussed, which included "upon completion of high school, the student will enroll in a two-year college of choice with support" and "upon completion of high school, the student will live in an apartment/house with support.  Id.  It was determined that "Chris will engage in transition to adult independent skills for over 50% of his school day from March '09 through May 19, 2009."  (R. at 684).  The CCC also discussed Chris's graduation at the February 20 meeting.  The committee notes from that meeting provide in part as follows:

> Chris has made tremendous progress while at Gibault-ABLE.  Since he is just an English 12 and a PE credit short of graduation, the CCC determined that, with the exception of instrumental ensemble, the rest of his school day would be centered upon improving his independence, community and functional living skills.

(R. at 678).

On March 9, 2009, the Parents submitted a dissenting opinion in response to the February 20 IEP, citing, *inter alia*, the opinion of "several members of the CCC in Terre Haute" that Chris "was not ready to graduate in May, nor ready to leave the ABLE program."  (R. at 686).  According to the Parents, they agreed to Chris's placement at the Gibault School and his participation in the credit recovery program only because Mr. Wiggers had assured them that educational services would be available to Chris until he turned twenty-two years old and that his graduation would be based on his readiness to graduate, not solely on the acquisition of academic credits.  When the Parents learned in

February 2009 that Chris's acquisition of course credits at the Gibault School (largely through the credit recovery program)[8] had made him eligible for graduation that May, they allege that they were concerned that Chris was not prepared for graduation and were also angry that the School appeared to be relying solely on the fact that he had acquired the requisite number of credits and had not taken into consideration his actual readiness to graduate.

On March 2, 2009, a week before submitting their dissenting opinion to the February 20 IEP, the Parents submitted a due process hearing request to the Indiana Department of Education ("IDOE") on behalf of their son. In that request, the Parents alleged that the School had failed to provide a FAPE to Chris and requested, *inter alia*, compensatory services, continued residential placement, and an appropriate IEP as remedies. The Superintendent of Public Education appointed Kristin L. Anderson, Esq., as the Independent Hearing Officer ("IHO") and a five-day hearing was scheduled to begin on June 8, 2009.

On May 8, 2009, the School filed a motion with the IHO for an order ending the School's obligation to provide services beyond Chris's receipt of a regular high school diploma. The IHO denied the School's motion and ordered the School to continue to provide services pending the outcome of the hearing. On May 19, 2009, Chris graduated from Holy Cross, the Gibault School's fully-accredited high school, with a regular high

---

[8] While at Gibault, Chris earned 5.5 credits in Holy Cross's traditional classroom format program and 14 credits through the credit recovery program.

school diploma. (R. at 4409, 4115).

The hearing convened on June 8, 2009, at the School's offices in Evansville, Indiana, and continued through June 12, 2009. The hearing was then recessed until Tuesday, June 16, 2009, when testimony was given by telephone. On July 6, 2009, the IHO issued her decision, determining that a two-year statute of limitations applied to Plaintiffs' claims and concluding that Defendants had provided a FAPE to Chris and that the School therefore had no obligation to provide further services. (R. at 4598-99). On September 8, 2009, after receiving a 30-day extension of time, the Parents filed their Petition for Review with the Indiana Board of Special Education of Appeals ("BSEA"). On October 8, 2009, the BSEA issued its decision, determining no error with the findings and conclusions issued by the IHO and upholding her order as written.

On November 9, 2009, the Parents filed the present appeal to this court, challenging those administrative decisions. Defendants filed a motion for a preliminary injunction on December 3, 2009 and, on December 21, 2009, Plaintiffs filed their own motion for injunctive relief. On February 10, 2010, the Court entered its Order Denying Defendants' Motion for Preliminary Injunction and Granting Plaintiffs' Motion for Preliminary Injunction, ordering Defendants to continue to pay until this matter is finally resolved all costs associated with Chris's placement and enrollment at the College Internship Program ("CIP") in Bloomington, Indiana, which provides post-secondary programs for individuals with Asperger's Syndrome and other learning differences.

<u>**Legal Analysis**</u>

**I.      Standard of Review**

The standard of review in IDEA cases "differs from that governing the typical review of summary judgment." <u>Heather S. v. Wisconsin</u>, 125 F.3d 1045, 1052 (7th Cir. 1997). The IDEA provides that a court reviewing the outcome of a due process hearing: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Here, the parties have submitted the administrative record for review, have filed cross motions for summary judgment, and have not requested that additional evidence be heard.[9] In this context, the dispute is decided on summary judgment, "which is the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." <u>Evanston Cmty. Consolidated School Dist. Number 65 v. Michael M.</u>, 356 F.3d 798, 802 (7th Cir. 2004) (citing <u>Hunger v. Leininger</u>, 15 F.3d 664 (7th Cir. 1994)).

In reaching its determination, the district court must give "due weight" to the administrative decision and "must not substitute its 'notions of sound educational policy'

---

[9] Plaintiffs filed two documents as attachments to their Response Brief in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply Brief in Support of Their Cross-Motion for Summary Judgment, but the Court accords them no significance because, pursuant to their Joint Motion Requesting Relief from Case Management Plan, Initial Pretrial Conference and Proposing Scheduling Order [Docket No. 24], which the Court granted on February 12, 2010 [Docket No. 28], the parties had already agreed that this case would be decided on the administrative record.

for those of the school district." Evanston Cmty., 356 F.3d at 802 (quoting Heather S., 125 F.3d at 1053). Where, as here, review is based solely on the administrative record, with regard to issues of fact, the Court "owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' This level of review is akin to the standards of clear error or substantial evidence." Alex R. v. Forrestville Valley Comm. Unit Sch. Dist. #221, 375 F.3d 603, 611 (7th Cir. 2004) (quoting School Dist. v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002)). The hearing officer's decision is entitled to no deference with regard to issues of law. Id.

As the party challenging the outcome of the administrative proceedings, Plaintiffs bear the burden of proving their claims by a preponderance of the evidence. See Alex R., 375 F.3d at 611 (citing Heather S., 125 F.3d at 1052).

## II.      Statute of Limitations

We turn first to the statute of limitations issue raised by the parties in their briefing. Plaintiffs argue that the IHO erroneously determined that a two-year limitations period applies in the case at bar. Although IDEA originally contained no limitations period for requesting due process hearings, in 2004 the Act was amended to include a two-year statute of limitations, subject to two limited exceptions. 20 U.S.C. §§ 1415(f)(3)(C)-(D).[10] Indiana has codified this two-year limitation in 511 IND. ADMIN.

---

[10] Section 1415(f)(3)(C) provides as follows:

(continued...)

CODE 7-45-3(c), which provides:

> The due process hearing request must allege a violation that occurred not more than two (2) years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process hearing request unless the parent was prevented from filing a due process hearing request due to:
>
> > (1) specific misrepresentations by the public agency that it had resolved the problems forming the basis of the due process hearing; or
> >
> > (2) the public agency's withholding of information from the parent that was required under this article to be provided to the parent.

Id. Here, the Parents submitted a due process hearing request to the Indiana Department of Education ("IDOE") on March 2, 2009. Thus, absent the application of one of the two enumerated exceptions, all claims in the instant case based on events occurring before March 2, 2007, are barred by the relevant two-year statute of limitations.

---

[10](...continued)
A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

Section 1415(f)(3)(D) provides two exceptions to the two-year limitation period for requesting a due process hearing:

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to –
>
> (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or
>
> (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

### A.    Specific Misrepresentations

The Parents contend that the two-year limitations period should be tolled because the School made specific misrepresentations regarding various issues, including its view as to the unlikelihood that Chris suffered from Asberger's Syndrome as well as the potential utility of further testing of Chris for disorders on the autism spectrum.  We address each of these allegations in turn.

The Parents argue that the School's conclusion following its 2004 evaluation that "Chris's behavior pattern is very unlikely to reflect Asperger's Syndrome," (R. at 457) is a misrepresentation that falls within the first exception to the two-year limitations period. They claim that the School misrepresented the quality and the appropriateness of the 2004 evaluation by failing to disclose, first, that the evaluation included only one test relating to autism spectrum disorders – an Asperger's Syndrome Diagnostic Scale checklist – and, second, that the checklist was allegedly completed by a resource teacher with no medical background.  However, there is no non-testimonial extrinsic evidence in the record regarding the identity or the credentials of the individual(s) who completed the checklist that supports the Parents' assertion, nor is there any evidence that the checklist was completed improperly, regardless of who completed it.  In fact, although Chris was subsequently diagnosed with PDD-NOS, a different disorder on the autism spectrum, at no point following the 2004 evaluation by the School was he diagnosed with Asperger's Syndrome by either the School's or the Parents' chosen medical professionals.  Moreover, it is undisputed that the Parents were provided a copy of the nine-page report regarding

the School's 2004 evaluation of Chris, which detailed the testing that was performed.

Thus, the Parents were aware at the time the evaluation was completed that the

Asperger's Syndrome Diagnostic Scale checklist was the only test for autism spectrum

disorders that was administered during that evaluation and therefore were not prevented at

that time from filing a due process hearing request based on that alleged failure. We find

no merit in the Parents' arguments in favor of tolling the limitations period on these

grounds.

Plaintiffs also contend that, in September 2005, the School misrepresented the

utility of further testing of Chris for autism spectrum disorders, which Plaintiffs claim

caused Chris's mother, Dr. Graves, to decline evaluations that could have led to an earlier

autism spectrum diagnosis. Specifically, Plaintiffs claim that, even though the CCC

referenced in Chris's September 13, 2005 IEP the need for further testing to rule out

autism spectrum disorders, Dr. Graves was told by the School's psychologist, Ms.

Groves, that she (Groves) did not believe that an evaluation would provide more

information as to Chris's needs,[11] and thus, the Parents refused to consent to additional

_____

[11] In support of this assertion, the Parents cite an entry from Ms. Groves's notes, dated
September 26, 2005, which provides in relevant part as follows:

> Conversation on phone w/Dr. Graves. Discussed possible need for eval. as
> indicated in IEP. In short, she is not interested in eval. unless it would have given
> more information as to needs. I told her I did not think an eval. would help that.

Pls.' Exh. 1. This document is not a part of the administrative record, having been instead
attached to Plaintiffs' response brief. Defendant has requested that the document and any
argument related to it be stricken for that reason. Although we recognize Defendant's concern,

(continued...)

testing at that time. Plaintiffs now maintain that Ms. Groves's statement was a misrepresentation, citing the fact that, when Chris's primary disability classification was changed to autism in 2008, he received many additional services, including the residential placement at Gibault.

Initially, we note that, even if Ms. Groves expressed doubts to Dr. Graves regarding the manner in which further testing would affect Chris's determined needs, we are not convinced that such a statement constitutes a misrepresentation as contemplated by the exception to the two-year statute of limitations. Even if it does, however, in order to fall within the first exception, the Parents must establish that they were "prevented from filing a due process hearing request" because the School misrepresented that it had "resolved the problems forming the basis of the due process hearing." 511 IND. ADMIN. CODE 7-45-3(c). Here, Plaintiffs based their due process hearing request on a number of issues, including the appropriateness of Chris's IEPs, the School's failure to classify Chris as autistic until April 2008, and Chris's placement in homebound instruction prior to the 2008-2009 school year. Having attended all of the CCC meetings occurring between March 2004 and March 2, 2007 (the time period relevant to the statute of limitations issue), Chris's mother was not only well aware of but actively engaged in the process culminating in the IEPs prepared for Chris, the services he was receiving, his homebound placement, and the fact that the School had not yet classified him as being on the autism

[11](...continued)
because the document does not affect our analysis, we shall not strike the exhibit.

spectrum.  Moreover, the Parents knew that the CCC had determined in September 2005 that Chris needed further testing to rule out an autism classification.  Accordingly, in light of all of these facts knowledge of which Plaintiffs clearly possessed, we cannot find that Ms. Groves's statement prevented the Parents from filing a due process hearing request in September 2005, if they had felt it was necessary.  Thus, we find no error in the IHO's determination that the two-year statute of limitations applies and should not be tolled.

**B.      Withholding of Information Required to be Provided**

Under the "withholding of information" exception as codified under Indiana law, a party must have been prevented from requesting a due process hearing due to "the public agency's withholding of information from the parent *that was required under this article to be provided to the parent*."  Id. (emphasis added).  As noted above, although our research does not reveal, and the parties do not point us to any Seventh Circuit or Indiana federal district court cases interpreting § 7-45-3(c), other district courts interpreting this exception under IDEA have held that it applies solely to the withholding of information regarding the procedural safeguards available to parents under that subchapter, such as filing a complaint and requesting an impartial due process hearing.  E.g., El Paso Independent Sch. Dist. v. Richard R., 567 F. Supp. 2d 918, 944-45 (W.D. Tex. 2008); School Dist. of Philadelphia v. Deborah A., 2009 WL 778321, at *5 (E.D. Pa. Mar. 24, 2009).  Plaintiffs do not allege that the School withheld information regarding the due process hearing procedures that the IDEA or Article 7 of the Indiana Administrative Code expressly requires the School to provide to the parent.  Thus, because there is no

allegation that the Parents were not apprised of the due process complaint process, we conclude that the "withholding of information" exception does not apply in this case.

For the foregoing reasons, we hold that the statute of limitations bars Plaintiffs' claims for compensatory education and remedies under the IDEA prior to March 2, 2007. Thus, we will not consider Chris's educational programming prior to that date.

## III.    The IDEA

Under the IDEA, a state that accepts federal funding to educate disabled children must adhere to certain conditions.  <u>Beth B. v. Van Clay</u>, 282 F.3d 493, 497 (7th Cir. 2002).  The IDEA requires a disabled child to be provided an education that is free, public, and appropriate ("FAPE"), 20 U.S.C. § 1412(a)(1), in the child's least restrictive environment ("LRE"), which means, to the maximum extent appropriate, with nondisabled children.  20 U.S.C. § 1412(a)(5).  The LRE requirement evidences "Congress's strong preference in favor of mainstreaming, but does not require, or even suggest, doing so when the regular classroom setting provides an unsatisfactory education."  <u>Beth B.</u>, 282 F.3d at 497 (citations omitted).

A FAPE is defined as an educational program "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  <u>Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley</u>, 458 U.S. 176, 188-89 (1982).  A student is provided a FAPE when the state has complied with the IDEA's procedural and substantive requirements.  <u>Board of Educ. of Tp. High School Dist. No. 211 v. Ross</u>, 486

F.3d 267, 273-74 (7th Cir. 2007). To comply with the procedural component, a school district must follow the "guaranteed procedural safeguards" set forth in the Act. 20 U.S.C. § 1415(a). Procedural violations are held to deny a student a FAPE only if they "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The substantive component requires a school district to develop and implement an appropriate IEP "reasonably calculated to provide some educational benefit to the child." Todd v. Duneland Sch. Corp., 299 F.3d 899, 905 (7th Cir. 2002) (citing Rowley, 458 U.S. at 206-07). An IEP meets this standard when it is "likely to produce progress, not regression or trivial educational advancement." Alex R., 375 F.3d at 615 (citation and quotations omitted). Once a school district has satisfied the procedural and substantive requirements of the IDEA, "the courts cannot require more; the purpose of the IDEA is to open the door of public education to handicapped children, not to educate a handicapped child to [his] highest potential." Board of Educ. of Murphysboro Comm. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ., 41 F.3d 1162, 1166 (7th Cir. 1994) (citation and quotations omitted).

Here, Plaintiffs contend that the School violated IDEA when it: (1) failed to diagnose Chris with autism until April 2008; (2) failed to ensure that Chris's homebound teacher had special education training; (3) placed Chris in homebound as opposed to

26

residential placement, resulting in a failure to educate him in the least restrictive environment; (4) failed to include an adequate transition plan in Chris's IEPs; and (5) prematurely graduated Chris.  We address these arguments in turn.

###     A.    Delayed Autism Classification

Plaintiffs first contend that the School denied Chris a FAPE by failing to identify his autism in a timely fashion.  Because, for the reasons detailed above, we hold that the two-year statute of limitations applies in this case, we do not consider any alleged action or inaction on the part of the School that predates March 2, 2007.

Although it is true that the School did not officially change the primary disability classification listed on Chris's IEP from "emotional disability" to "autism spectrum disorder" until April 2008, it is clear that the School had taken Chris's autism diagnosis into consideration when preparing his IEPs long before that date.  Beginning with the IEP prepared for Chris in September 2006, and continuing in each of his subsequent IEPs, the School listed "PDD-NOS," a condition on the autism spectrum, under the heading labeled "health problems."  Accordingly, we cannot conclude that the School was unaware of or ignored Chris's medical issues related to autism spectrum disorder, despite having not classified autism as his primary educational disability at that time.  Throughout the entire time period applicable to our discussion, it is unmistakably clear that the School consistently reported on Chris's medical diagnosis of PDD-NOS, (and also included other of Chris's diagnosed medical issues, including bipolar disorder and anxiety disorder, on the health problem section of his IEPs), and, pursuant to his IEPs, provided various

occupational and behavioral services in addition to a great number of general education accommodations in an effort to address his varied needs related to that diagnosis. Thus, the facts before us are distinguishable from those in <u>Amanda J. v. Clark County School District</u>, 267 F.3d 877 (9th Cir. 2001), in which the Ninth Circuit concluded that "the IEP team could not create an IEP that addressed [the student's] special needs as an autistic child without knowing that [the student] was autistic." <u>Id.</u> at 894.

Nor do we find error with the IHO's determination that the agreed upon adaptations and modifications provided for in the IEPs that were prepared for Chris between March 2007 and April 2008 (before his primary disability classification was changed to autism) were adequate to address his academic needs and to provide educational benefit as required by IDEA. The record before us indicates that, when Chris actually attended school and utilized those modifications during that time period, he received good grades and positive reports from his teachers. The problem, however, seemed to be Chris's attendance. In addition to PDD-NOS, Chris also suffered from anxiety disorder and mood disregulation, which often rendered him unable or unwilling to attend his classes outside the home or even to participate in homebound instruction. The severity of Chris's anxiety and mood disorder eventually prevented him from attending any classes outside of the home, prompting the School to change his LRE to fully homebound in January 2008. Even after his LRE was switched to homebound, his anxiety continued to significantly limit his ability and willingness to participate in his homebound classes. By the time Chris was enrolled in the ABLE program at Gibault, he

had been able to participate in no more than ninety minutes per week of instruction at home.

Plaintiffs argue that, had the School begun listing autism spectrum disorder as Chris's primary disability classification on his IEPs in September 2006 when it first recognized that he suffered from PDD-NOS, he could have enrolled in the ABLE program approximately two years earlier, thereby receiving the benefit of the additional services offered by the program at a much earlier date. It is true that, once Chris was enrolled in the ABLE program at Gibault, the School augmented his IEP with additional services offered by the program that were not on his previous IEPs and that Chris adapted well to the new environment, including for the first time attending classes much more regularly. However, the evidence in the record supports the conclusion that the residential placement was delayed, not by the School's failure to classify autism spectrum disorder as Chris's primary disability or to any other significant flaw in his IEPs, but rather by the uncertainty of all parties involved as to whether the residential placement would exacerbate Chris's anxiety levels. Although Chris's doctors did discuss the possibility of residential placement as early as March 2007, they expressed concern regarding immediately pursuing such a placement while Chris was experiencing such severe anxiety. Instead of a residential placement, the medical professionals recommended that time be given initially to implement a new medication schedule. Once Chris's doctors definitively advised residential placement in December 2007, there is no indication that the School unduly delayed in pursuing such options or changing Chris's

29

primary disability classification in order to facilitate his eligibility for residential placement.

Giving due deference to the IHO's determinations, we find for the foregoing reasons that the School's failure prior to April 2008 to identify autism spectrum disorder as Chris's primary disability classification did not violate IDEA's requirement that school districts timely and properly identify a child's disability. Nor is there evidence in the record to suggest that Chris's IEPs had other significant flaws that prevented him from receiving the benefit of the services provided for therein. Thus, we hold that Chris was not denied a FAPE on this basis.

### B. No Special Education Training for Homebound Teacher

Plaintiffs next contend that the School denied Chris a FAPE during his homebound placement because his homebound teacher had no training in special education. Article 7 of the Indiana Administrative Code provides in relevant part: "For a student who is eligible for special education and related services, instruction and related services must be provided by appropriately licensed personnel." 511 IND. ADMIN. CODE § 7-42-12(e). Chris's homebound teacher during the relevant time period, to wit, from March 2007 through May 2008, was Suzette Fritz.[12] It is undisputed that Ms. Fritz held a general education license, but was not a certified special education teacher.

---

[12] In addition to receiving homebound instruction from Ms. Fritz, the IHO noted that Chris's Teacher of Record ("TOR") through November 2007 was a trained member of the School's Autism Management Team with whom Chris spent the resource hour when he attended classes outside of the home.

Following the due process hearing, the IHO determined that there was no evidence to support a conclusion that Ms. Fritz lacked any skill or training that would or could have made Chris's homebound experience more successful, and thus, that Ms. Fritz's instruction did not result in the denial of a FAPE for Chris. Mindful of the strong deference we are required to give the IHO on matters where educational expertise is relevant, we cannot find error with this determination. It is well-recognized that "'[f]ederal courts are generalists with no expertise in the educational needs of handicapped children, and will benefit from the factfinding of a state agency with expertise in the field.'" Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 865 (6th Cir. 2004) (quoting Renner v. Bd. of Educ. of Public Schools of City of Ann Arbor, 185 F.3d 635, 641 (6th Cir. 1999)). The determination regarding whether a teacher was properly qualified to implement the services and programs set forth by the IEP is just such an area where we rely on the imputed educational expertise of the IHO.

Except for the November 2007 IEP, which referenced that Chris's post-secondary goal was to attend a technical or trade school with support, the other IEPs prepared for Chris listed that his post-secondary goal was to attend a college or university with support. To achieve these goals, Chris needed to obtain general education credits, which Ms. Fritz was licensed to teach and which she taught Chris when she was in the home. There appears to be no dispute that, when working with Chris, Ms. Fritz followed and implemented the individualized general education considerations that the CCC set out for him in his IEPs. In light of these facts, we find no error with the IHO's finding that Ms.

Fritz's instruction did not deny Chris a FAPE. Moreover, even if deficiencies could have been associated with Ms. Fritz's lack of special education certification, we find that the additional instruction Chris has been afforded throughout the pendency of this litigation by virtue of the stay-put provision which has now been in effect since the IHO rendered her decision approximately two years ago is sufficient to fully compensate for any such deficiencies.

### C.    LRE

Plaintiffs also contend that Chris's homebound placement from March 2007 through May 2008 violates the mandate of the IDEA that children should be educated in the least restrictive environment ("LRE") according to their individual needs. Plaintiffs assert that, rather than being in homebound placement during that time period, Chris should instead have been in residential placement which is less restrictive on the placement continuum set forth in 511 IND. ADMIN. CODE 7-42-10(b)(4).[13]  It is true that,

---

[13] 511 IND. ADMIN. CODE 7-42-10(b)(4) provides as follows:

(b) The public agency must do the following:
...
(4) Ensure the availability of a continuum of placement options for students in kindergarten through the school year in which students become twenty-two (22) years of age that includes the following:

> (A) General education classroom with special education and related services provided during the instructional day.
>
> (B) Resource room with special education and related services provided outside the general education classroom during the instructional day.

(continued...)

following their examination of Chris in March 2007, the CRG staff, including Dr. Adinamis, suggested the possibility of pursuing residential placement for Chris. However, at that time, Dr. Adinamis expressed concern about the effect residential placement would have on Chris in light of the severity of the anxiety issues he was then experiencing. The CRG staff further advised that, before pursuing residential placement, time be given to implement the medication and treatment plans they recommended. In May 2007, in accordance with the recommendation of the CRG, Chris's mother, Dr. Graves, stated that she wanted to wait to see if Chris's medications were effective before exploring residential placement. (R. at 933).

It was not until December 28, 2007, after concluding that the medication and therapeutic plans were not working, that Dr. Adinamis definitively advised the pursuit of residential placement. The CCC discussed Dr. Adinamis's recommendation at the January 31, 2008 meeting, concluding that community-based services should be explored

_____

[13](...continued)
> (C) Separate classroom in a general education school building with special education and related services provided outside the general education classroom during the instructional day.
>
> (D) Separate public or nonpublic nonresidential school or facility with special education and related services provided.
>
> (E) Public or nonpublic residential school or facility with special education and related services provided to students living at the school or facility.
>
> (F) Homebound or hospital setting with special education and related services provided at the student's home, a hospital, or other noneducational site selected by the public agency.

for Chris. On February 26, 2008, in an email to Mr. Wiggers, Chris's mother stated: "We don't see a viable option for substantive intervention other than residential placement." (R. at 946). At the March 5, 2008 conference, the CCC directed that residential programs be explored, and Chris was placed in the ABLE program at Gibault in April 2008. However, because Gibault needed time to secure proper staffing to accommodate Chris's placement, he did not begin attending classes there until June 2008.

Upon careful review of these facts, it is clear that, prior to the January 2008 CCC meeting, all parties involved, including the parents, their physicians, the School, and Chris himself, were uncertain whether residential placement would be appropriate for a student with the degree of anxiety evidenced by Chris. Accordingly, it appears that homebound placement was, at that time, the most appropriate educational situation in light of Chris's psychiatric issues, as his anxiety was so debilitating at that point that he was unable to attend any regular classes outside his home. There is no evidence that, once Chris's doctors recommended discontinuing attempts to improve his functioning through medication and instead advised residential placement at the end of December 2007, the School either disputed this recommendation or unduly delayed in pursuing such a placement. As the IHO recognized, a residential placement takes more time to effectuate than certain other educational services as it requires the participation of third parties in addition to the parents and the school district, and the placement process includes various steps to ensure that a particular facility is appropriate for and acceptable to all involved. In light of these facts, we affirm the IHO's determination that Chris's

homebound placement from March 2007 through June 2008 did not violate the LRE requirement.

## D. Transition Plan

The IDEA requires that every IEP, beginning no later than the one that will be in effect when the child is 16 years old, includes "appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills," and to describe the "transition services (including courses of study) needed to assist the child in reaching these goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb). Chris turned sixteen on December 20, 2006, which means that a transition plan should have been in place by the 2006-2007 school year.

The record establishes that the CCC discussed transition planning at various conferences, including those held in May 2005, May 2006, September 2005, November 2007, and February 2009. At these conferences, it was anticipated that Chris would seek post-secondary education rather than employment following graduation, that he would attend college with support,[14] live independently with support, and require limited support in recreation and leisure activities. However, while general observations were made at the CCC meetings held in May 2005 through November 2007 regarding the transition

---

[14] The CCC determined in November 2007 that rather than college or university with support, Chris could be expected to attend technical or trade school with support. There is no explanation for this change and, at the next meeting where transition skills were discussed, the CCC once again listed college or university with support as Chris's expected transition.

skills that Chris needed to acquire (such as "interpersonal coping skills," "ability to travel independently around building," "use city bus," and "wants to get a job at the bowling alley"), there is no evidence that a detailed transition plan was created for Chris by November 2007.

Chris's January 2008, March 2008, and April 2008 IEPs each state that a "[t]ransition plan *will* be developed/discussed at the Annual Case Review later this year." (R. at 579, 593, 619) (emphasis added). The summary of the CCC's September 2008 meeting provides that the transition plan is "to be determined at the next case conference." (R. at 669). The next case conference meeting occurred in February 2009, approximately three months before Chris graduated. At that meeting, the CCC did address a transition plan. It was determined at that meeting that "Chris will engage in transition to adult independence skills for over 50% of his school day from March '09 through May 19, 2009." (R. at 1667). The CCC also indicated that, upon completion of high school, Chris would enroll in a two-year college of his choice with support, would participate in job development services from a community rehabilitation program to obtain competitive employment, and would live in an apartment or house with support. (R. at 1676). In order to achieve those post-secondary goals, the CCC listed ten transition goals for Chris, which included earning credits toward graduation, demonstrating functional and employment related math skills, identifying and contacting preferred college(s), applying to and completing the intake process for Vocational Rehabilitation, completing necessary paperwork for a State ID and transit card, and participating in

community-based instruction for banking. The CCC made clear that Chris would require assistance to accomplish these goals successfully. (R. at 1676). There was no indication in the IEP that successful completion of these goals was required before graduation. The CCC scheduled another case conference for April 21, 2009 to discuss a final detailed transition plan, but Chris's parents refused to attend that meeting.

It is apparent that no comprehensive transition plan was in place by the time Chris turned sixteen as is required under IDEA. The failure of the IEP to include skills is a procedural flaw. Board of Educ. of Tp. High School Dist. No. 211 v. Ross, 486 F.3d 267, 276 (7th Cir. 2007). "Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity ... clearly result in the denial of a [free appropriate public education]." Id. (quoting Heather S., 125 F.3d at 1059). Thus, we next address whether the School's failure to include an adequate transition plan in Chris's IEP's before February 2009 denied Chris of something to which he was entitled.

The IHO determined that any inadequacies in transition planning did not deny Chris of a FAPE because, prior to his residential placement, no reasonable transition plan could be developed or implemented for him. Up to that point, Chris's anxiety and mood disorder so severely impacted his ability and willingness to develop life skills appropriate for his age that he was not in a position to benefit from an in-depth transition plan that included advanced vocational or social skills. The IHO determined that Chris had received comprehensive life and social skills training once he began attending Gibault's

ABLE program and that his IEP at Gibault, combined with the monthly progress reports he received there, were sufficient to keep all parties apprised of and focused on the activities Chris needed in his post-secondary transition.

There is insufficient evidence in the record from which we might conclude that the IHO's finding regarding the transition services provided Chris was erroneous. We agree with the IHO's determination that, while Chris was homebound, his anxiety and mood disorder issues were so severe that he was not in a position to benefit from an in-depth transition plan addressing social and vocational support services following graduation. Cf. Ross, 486 F.3d at 276 (holding that the school's deferral of transition planning did not deny the student a FAPE when the student was not in a position to benefit from such services). Thus, although the School erred by failing to include more specific transition plans in Chris's IEPs during the relevant time period (or at least without providing further explanation as to their absence), that procedural flaw did not result in the denial of a FAPE for him.

Once Chris was placed in the ABLE program at Gibault, life and social skills training was incorporated into his daily activities and memorialized in the daily reports prepared by Gibault staff members and monthly and quarterly reports provided to the Parents discussing Chris's progress. It seems clear that Chris will likely continue to need support in these areas throughout his adult life, and such support was always contemplated by the parties as evidenced by the fact that Chris's IEPs have uniformly indicated that he was expected to attend college or trade school *with support* and live

independently *with support*.  The record fully and fairly supports the IHO's conclusion that the School provided adequate transition services when Chris was in a position to benefit from them and that he demonstrated sufficient competence in such areas to transition to adult-level educational and vocational support services as intended.  We therefore cannot hold that the procedural inadequacies associated with the School's delay in discussing a concrete transition plan for Chris resulted in the loss of educational opportunity.

### E.    Graduation

Under Indiana law, public school corporations are required to provide a FAPE to any qualifying student unless the student graduates with a high school diploma, or at the conclusion of the school year in which the student becomes twenty-two years old.  511 IND. ADMIN. CODE 7-33-2(b).  Similarly, the relevant federal regulations provide: "The obligation to make FAPE available to all children with disabilities does not apply with respect to the following: . . . Children with disabilities who have graduated from high school with a regular high school diploma."  34 C.F.R § 300.102(a)(3)(i).  Additionally, a number of courts have held that in order to graduate a student with a disability under the IDEA, the student must not only meet the general graduation requirements, but must also make progress on or complete the IEP goals and objectives.  E.g., Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205, 2002 WL 433061, at *14 (N.D. Ill. Mar. 20, 2002) (citing Churan v. Walled Lake Consol. Sch., 839 F. Supp. 465, 474 (E.D. Mich. 1993), aff'd, 51 F.3d 271 (6th Cir. 1995)).  But see Sammons v. Polk County Sch. Bd., 2005 WL 2484640

(M.D. Fla. Oct. 7, 2005) (holding that IDEA does not impose the additional requirement of progress on IEP goals and objectives on disabled students that is not imposed on non-disabled students in order to graduate).

Plaintiffs' challenge to Chris's graduation is two-fold. First, they argue that the graduation should not be upheld on academic grounds because, even though Chris earned a sufficient number of credits to graduate, his rapid acquisition of credits largely through the credit recovery program violated Indiana's seat time requirements. Second, Plaintiffs contend that, even if the academic credits are valid, Chris had not made sufficient progress in the areas of social, life, and vocational skills as required by his IEP to justify his graduation. We address these arguments in turn.

The IHO found that Chris completed academic work to qualify him to receive a "Core 40" college preparatory high school diploma, that Holy Cross has the authority under Indiana law to grant Chris his high school diploma and did so, and that, in light of those facts, there was no authority to invalidate Chris's graduation on academic grounds. Although we concede that the rapid manner in which Chris earned credits using the credit recovery program raises some concerns, upon careful review of the record, we find that there is sufficient evidence to support the IHO's conclusion and that this is the sort of determination for which the IHO is entitled to deference.

Under state regulations in place through March 20, 2009, Indiana maintained a seat-time requirement of seventy-five hours per each hour of class credit earned. (R. at 4373). For computer-based classes, such as the credit recovery program at Gibault,

students were still expected to complete a minimum of seventy-five hours per high school credit, unless the school obtained a non-standard course waiver of the requirement. (R. at 1368). During the time period that these guidelines applied to Indiana schools, Chris acquired many of his credits at Gibault using a computer-based credit recovery program. There is no dispute that he did not meet the "seat time" requirement for each credit he earned using that program, and that Gibault's high school, Holy Cross, did not have a non-standard course waiver of the seat-time requirement for its credit recovery program at the time Chris earned the majority of his recovery credits. (R. at 3558, 3656).

However, the evidence presented to the IHO at Chris's due process hearing included a memorandum, dated March 20, 2009, from the Indiana Department of Education ("IDOE"), which addressed changes in policies that affected non-standard programs, such as Gibault's credit recovery program. The memorandum stated that, at a February 4, 2009 meeting, the IDOE had determined that schools could "waive the definition of 'credit' to the extent that students must complete a course that includes a minimum amount of instruction. This allows schools to award credit based on demonstration of proficiency against the academic standards ...." (R. at 1807). The IDOE memorandum does not address whether this change was to apply retroactively, but, Gary Wallyn, the Director of the Office of School Accreditation and Awards for the IDOE, testified before the IHO that "it does allow for a school to review student's earned proficiency in a subject area so that an administrator at the school would be able to look at previous proof of proficiency and make a determination on credit." (R. at 4378). Mr.

Wallyn further testified at Chris's due process hearing that, even if a school did not have a waiver for its non-standard course offerings, credits earned by students in those courses would not be invalidated and that "[i]t's a local decision as far as how the credit was awarded and ... the school has the ultimate decision ... so long as they're following and looking at curriculum and meeting the standards ...."  (R. at 4363, 4365, 4370).

At the due process hearing, Holy Cross's principal, Cary Molinder, testified that Chris "mastered those skills set forth as required by the State of Indiana" and that "there is no doubt in [his] mind that [Chris] has earned a diploma."  (R. at 3655, 3665, 3667). Mr. Molinder's testimony is bolstered by Chris's passing ISTEP and above average SAT standardized test scores, (R. at 1295, 1798), his final grade point average, (R. at 1439), his acceptance into college, and the results of educational testing procured by Chris's parents which showed that Chris scored average or above average in almost all academic areas tested.  (R. at 1404-26).  In light of these facts, we are unable to find that the IHO erred in determining that Chris's academic work qualified him to receive his "Core 40" diploma from Holy Cross.

We turn now to the question of whether Chris made sufficient progress toward his IEP goals and objectives in the areas of social, life, and vocational skills to qualify for graduation in line with IDEA standards.[15]  As discussed above, in Chris's February 2009

---

[15] Although the Seventh Circuit has not yet opined as to whether IDEA imposes this additional requirement for graduation on disabled students, Defendants have not contested this requirement.  Accordingly, we address the issue.

IEP, the CCC created ten transition goals intended to prepare Chris for his post-secondary transition, which included earning credits toward graduation, identifying and contacting preferred college(s), applying to and completing the intake process for Vocational Rehabilitation, completing necessary paperwork for a State ID and transit card, participating in community-based instruction for banking, and demonstrating functional and employment related math skills. Although it is true that there is no requirement contained in the IEP that Chris reach these goals before he was allowed to graduate, the IHO found that Chris had in fact either met or made substantial progress on each by the time he graduated.

For example, as discussed above, Chris earned the requisite number of credits to graduate. He expressed interest in the University of Vincennes and Ivy Tech, and applied to and was accepted (pending graduation) by the former. There is evidence in the record that Chris attended a community outing to a bank during which he questioned bank employees about checking accounts and testimony from the Gibault staff confirms that Chris met his banking goals. A vocational assessment was completed for Chris, and, on March 9, 2009, he applied for Vocational Rehabilitation Services with Indiana Family and Social Service Administration. The IHO determined that, in light of the programs in which Chris participated that dealt with various math-related skills, such as check writing, calculating the bill off of a menu, and calculating bus fares, as well as the fact that he completed time cards and was paid for his work in the kitchen, and his above average I-STEP and SAT math scores, Chris either had either accomplished the goal of acquiring

"functional and employment related math skills" or in any event had the ability to quite easily learn whatever other skills were encompassed in that term.

It is true that the CCC agreed that it would be unreasonable to expect that Chris would be able to navigate public transportation without assistance by the time he graduated.[16] However, as was discussed above, the parties always contemplated that Chris would require continued assistance in some areas of independent living following graduation. Upon careful review of the evidence, we are persuaded that Chris had either achieved or significantly progressed toward the objectives set forth in his IEP so as to be prepared to transition to available adult services to receive such continuing support. The evidence shows that additional support from such organizations as Vocational Rehabilitation and the Bureau of Developmental Disability Services is in place to help Chris achieve his post-secondary employment and independent living goals, but that such services cannot be utilized until he is no longer in residential placement through the IDOE. While IDEA places the burden of providing transition services programs on school districts, which must provide a program with a "meaningful educational benefit towards the *goal* of self-sufficiency," Deal, 392 F.3d at 864 (emphasis added), as the IHO recognized in this case, a school district cannot be required to educate a student to a level of independence that was never contemplated by the parties in the first place.

For the foregoing reasons, we find that Chris not only accumulated the required

---

[16] Although the evidence shows that Chris cooperated with the "travel training" given by Gibault staff, bus transportation continued to be a source of significant anxiety for him.

credits to graduate but also made sufficient progress on his IEP goals and objectives to satisfy IDEA's requirements for graduation. Accordingly, we do not find error with the IHO's decision upholding Chris's graduation.

## IV. Conclusion

For the reasons detailed in this entry, we <u>DENY</u> Plaintiffs' Motion for Summary Judgment and <u>GRANT</u> Defendants' Motion for Summary Judgment. The preliminary injunction issued on February 10, 2010, ordering Defendants to pay all future costs associated with Chris Tindell's placement and enrollment at the College Internship Program in Bloomington, Indiana, until further order of the Court is now lifted. Final judgment shall enter accordingly.

IT IS SO ORDERED.


Date: _____07/29/2011_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Jean Marie Blanton
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
jblanton@zsws.com

Allyson Rebecca Breeden
ZIEMER STAYMAN WEITZEL & SHOULDERS
abreeden@zsws.com

Mitchell M. Pote
LAW OFFICE OF MITCHELL M. POTE
mitchell.pote@gmail.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com